**UNITED STATES of America,
Appellee,**

v.

**Salvador PARDO–BOLLAND and Rene
Bruchon, Defendants-Appellants.**

**No. 243, Docket 29218.**

United States Court of Appeals
Second Circuit.

Argued Dec. 4, 1964.

Decided June 29, 1965.

See also D.C., 229 F.Supp. 473.

Jack D. Samuels, Asst. U. S. Atty., Southern District of New York (Robert M. Morgenthau, U. S. Atty., and David M. Dorsen, John S. Martin, Jr. and William M. Tendy, Asst. U. S. Attys., on the brief), for appellee.

Bernard Tompkins, New York City (Tompkins & Lauren, New York City, on the brief), for appellant Pardo-Bolland.

Albert J. Krieger, New York City, for appellant Bruchon.

Before FRIENDLY and SMITH, Circuit Judges, and BLUMENFELD, District Judge.*

J. JOSEPH SMITH, Circuit Judge.

The defendants Salvador Pardo-Bolland, Rene Bruchon and Juan Carlo Arizti were convicted after trial before a jury in the United States District Court for the Southern District of New York, John M. Cannella, J., of violating Title 21, U.S.C. §§ 173–174, which prohibits the receiving, concealing and selling, etc. of narcotics illegally imported into the United States, and of conspiring to violate the federal narcotics laws. Bruchon and Bolland, sentenced respectively to fifteen and eighteen year terms concurrently on each count, and fined $20,000 on each count, appeal their convictions. Arizti received a sentence of ten years imprisonment and was fined $20,000; he has not perfected his appeal. We find no error and affirm the convictions of Bruchon and Bolland.

### I.   The Evidence

The facts, of which there was evidence at the trial, may be summarized as follows: On February 10, 1964, the appellant Pardo-Bolland, then Mexican Ambassador to Bolivia, registered at a hotel in Cannes, France under the assumed name of Lorenzo Suarez de Mendoza and, at the same time, cancelled a reservation he had previously made for the Uruguayan Minister Plenipotentiary, the defendant Arizti. The next morning Bolland met Arizti, upon the latter's arrival in Cannes, at the Cannes railroad station. Two days later, Bolland was seen leaving his hotel and driving away in a car accompanied by two alleged co-conspirators, Gilbert Coscia and Jean Baptiste Giacobetti, and a short while after that Bolland and Coscia were seen together with

*   Sitting by designation.

Arizti at Arizti's hotel. Following two separate meetings, one between Bolland, Coscia and Giacobetti, and the other between Coscia and Arizti, Arizti on February 15 departed by plane from the Nice airport for Montreal carrying with him seven pieces of luggage, four of which were handed to him by a porter only minutes before he boarded the aircraft. Upon his arrival in Montreal, Arizti managed to get the baggage through customs without its being inspected on the strength of his diplomatic passport. However, unbeknown to him, a member of the Royal Canadian Mounted Police, acting under authority of a writ of assistance, had at the Montreal airport opened one of the four bags that Arizti had been handed at the Nice airport and had observed a number of plastic bags containing a white powder. After leaving the airport, Arizti went directly to the Montreal train station where he checked the bags in public coin lockers. Two days later the Canadian police, again acting under authority of a writ of assistance, opened the lockers and removed the four suitcases. Of the 62 kilograms of heroin found inside, 61 kilograms were removed (approximately a quarter kilogram was left in each bag) and replaced with flour, and the bags were then returned to the lockers.

In the meantime, on February 15 the appellant Bruchon flew from Geneva to New York carrying a passport which, though it bore his picture, was issued under the name of Jean LeRoux; Bruchon registered at Manhattan's Americana Hotel under that name. The following day Bolland flew from Paris to New York and registered in Room 1105 of the Elysee Hotel in the City; he also made a reservation at the same hotel for Arizti for February 18. That evening Bolland, who, along with Bruchon was under constant surveillance by federal narcotics agents, sent a cablegram from Grand Central Station addressed to one Carmen Lopez in Nice, France, thanking her for her hospitality and signed "Lorenzo Suarez." After he had written out his message and left, the narcotics agent who was following him entered the Western Union office, displayed his badge and demanded to see the writing. The clerk acquiesced, and the agent made a handwritten copy.

On February 18, Arizti arrived by train at New York's Pennsylvania Station carrying with him the four suitcases which now contained a relatively small quantity of heroin and a much larger amount of flour. He immediately checked the bags in a parcel room and received four baggage checks. Within two hours after Arizti's arrival in New York, a narcotics agent who had traveled on the same train from Montreal, succeeded in obtaining a search warrant signed by United States District Judge Noonan and proceeded to search the luggage. A portion of the contraband contents was removed, and the bags were replaced in the station's parcel room.

Arizti, upon leaving Pennsylvania Station, went directly to the Elysee Hotel where he registered for Room 1102A, the room reserved for him by Bolland. Almost immediately after Arizti had checked into his room, Bolland joined him there. Narcotics agents occupied an adjoining room and, with the help of electronic listening devices, were able to overhear Bolland tell Arizti that he would see "the man" that day and that "on business like this you have to be extra careful."

Following his meeting with Arizti, Bolland promptly went to the Americana Hotel where he asked the room clerk for a Mr. Blanc. He was told that no one with that name was registered there. Bolland made the same inquiry at the Savoy Hilton and received the same answer. He then proceeded to an office of the American Cable and Radio Company and wrote out a second cablegram addressed to Carmen Lopez and containing the following message: "Cousin is not found address indicated," signed "Richard Bernard." The narcotics agent who was watching Bolland saw this message in the same manner as the first. It was then transmitted and in due course re-

ceived in France, as in the case of the first cablegram, by Coscia who was posing as one Roby.

On his return to the Elysee, Bolland spoke to Arizti and was overheard, by means of the electronic eavesdropping apparatus, telling Arizti about his inability to locate Mr. Blanc. Bruchon or LeRoux, of course, and not Blanc, was the man Bolland should have been looking for. According to the Government, that apparent mistake was corrected two days later when Bolland received a telephone call from a "Dr. Guitterez" in Nice, France. After receiving the call, Bolland went back to the Americana Hotel, made an inquiry at the desk and proceeded to Room 4924, the room into which Bruchon had checked. Bolland stayed no longer than about two minutes, and after he left, Bruchon followed a short time later. That afternoon Bruchon was observed as he dropped a set of keys in a trash basket located on the corner of 51st Street and Broadway—those keys were found to fit the four suitcases that had been deposited in the parcel room of Pennsylvania Station.

The next morning, February 21, both Bruchon and Arizti received telephone calls advising them to leave New York immediately. Arizti relayed the warning to Bolland, and both he and Bolland thereupon went directly to a Pan American office and booked the first available space on two separate flights to Uruguay and Bolivia respectively. Their arrests followed.

At about the same time as Arizti and Bolland were preparing for their departure, Bruchon also was making haste to leave the country. He proceeded directly to a Swiss Air office and reserved a seat on the first available flight to Switzerland. As he left the office and walked down the street, he apparently realized that federal agents were approaching him and quickly dropped an envelope found to contain the baggage checks to the four unclaimed suitcases in Pennsylvania Station.

## II. The Cablegrams

The trial court, over the objections of defense counsel, permitted the two cablegrams sent by Bolland to Carmen Lopez (Coscia) to be admitted into evidence. Defendant Bolland contends that the cablegrams were inadmissible in that they were illegally obtained under Section 605 of the Federal Communications Act which provides in pertinent part as follows:

> "No person receiving or assisting in receiving, or transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except * * * in response to a subpoena issued by a court of competent jurisdiction, or on *demand of other lawful authority;* and no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person; * * *." (Emphasis added.)

The Government, on the other hand, argues that the agent's obtaining the contents of the messages constituted a "demand of other lawful authority" under the statute and that, in any event, the subsequent subpoenas of the cablegrams rendered them admissible. While we do not necessarily agree with the Government's interpretation of this statutory language, we do find that the Government's alternative ground for admissibility is compatible with Section 605 and the cases decided thereunder. In other words, the cablegrams were admissible because knowledge of their transmission was acquired from an independent source and because they were obtainable and were in fact subsequently obtained by other legal means. So far as the appellant Bruchon is concerned, his standing to object is doubtful for he is not a sender. Goldstein v. United States, 316 U.S. 114, 62 S.Ct. 1000, 86 L.Ed. 1312 (1941).

The admission in evidence of the contents of the cablegrams under the circumstances of this case was not error. Where, as here, the sending of the messages is independently known to the officers from their own observations, the communications could have been obtained on demand by the agents' superior, the Secretary of the Treasury, and subpoenas were in fact obtained and served prior to trial with respect to the transmittals, there has been sufficient compliance, even though belated, with the Communications Act, and appellants' rights have not been violated. Indeed, Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), relied on by appellants, itself stated that information improperly acquired will be admissible if elsewhere "gained from an independent source,"

251 U.S. at 392, 40 S.Ct. at 183, an exception that surely applies to the statutory protection of Section 605 at least as readily as to the constitutional right involved in Silverthorne.

The narcotics agent assigned to keeping Bolland under surveillance observed Bolland both times that Bolland entered the telegraph offices and wrote out the cables; it was natural to expect that the agent and his co-agents would be curious about their contents and would obtain copies.[1] If the agent had been less zealous in carrying out his assignment and had appraised the situation with greater care, he probably would not have intercepted the cablegrams when he did and instead would have relied on the power of the Secretary of the Treasury, pursuant to Title 21, U.S.C. § 198a, 198b,[2] and arranged to subpoena all cables sent

1. In Silverthorne Lumber Co. v. United States, supra, the Court expressly recognized that even though the seizure of the evidence in the first instance may have been illegal, the facts disclosed thereby may nevertheless be proved like any others if knowledge of them is gained from an independent source. Said the Court:

"The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, * * *" 251 U.S. at 392, 40 S.Ct. at 183.

2. Title 21 U.S.C. §§ 198a and 198b provide as follows:

§ 198a. Authority of Secretary of Treasury to administer oaths, issue subpenas, and compel attendance of witnesses; fees and mileage of witnesses

For the purpose of any investigation which, in the opinion of the Secretary of the Treasury, is necessary and proper to the enforcement of the laws of the United States relating to narcotic drugs and marihuana, the Secretary of the Treasury is empowered to administer oaths and affirmations, subpena witnesses, compel their attendance, take evidence, and require the production of any records (including books, papers, documents, and tangible things which constitute or contain evidence) which the Secretary of the Treasury finds relevant or material to the investigation. The attendance of witnesses and the production of records may be required from any place in any State or in any Territory or other place subject to the jurisdiction of the United States at any designated place of hearing: *Provided*, That a witness shall not be required to appear at any hearing distant more than one hundred miles from the place where he was served with subpena. Witnesses summoned by the Secretary of the Treasury shall be paid the same fees and mileage that are paid witnesses in the courts of the United States.

§ 198b. Service of subpena; proof of service

A subpena of the Secretary of the Treasury may be served by any person designated in the subpena to serve it. Service upon a natural person may be made by personal delivery of the subpena to him. Service may be made upon a domestic or foreign corporation or upon a partnership or other unincorporated association which is subject to suit under a common name, by delivering the subpena to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process. The affidavit of the person serving the subpena entered on a true copy thereof by the person serving it shall be proof of service.

between certain times—a course that might have led to a more substantial divulgence of private communications than that pursued. The ease with which the Secretary of the Treasury may legally authorize the issuance of a subpoena in furtherance of a narcotics investigation points to another very significant difference between this case and Silverthorne, supra. In Silverthorne, the Government was required to meet the more stringent test of satisfying a judicial officer that it was entitled to a search warrant.

In any event, this apparent mistake in judgment was unequivocally rectified when the two cablegrams were obtained by subpoenas prior to trial.[3] As already noted, there was sufficient information independent of the illegal interceptions to justify the subsequent applications for and granting of subpoenas, and it was a near certainty that the cables would have been acquired by subpoena even had the original disclosures never occurred. See Somer v. United States, 138 F.2d 790, 792 (2 Cir. 1943); Sullivan v. United States, 95 U.S.App.D.C. 78, 219 F.2d 760, 762 (1955). The contents of the cablegrams were not rendered inadmissible under the "fruit of the poisonous tree" doctrine. See Peek v. United States, 321 F.2d 934, 939 (9 Cir. 1963).

Compare United States v. Paroutian, 299 F.2d 486 (2 Cir. 1962).

### III. Electronic Eavesdropping

A substantial part of the case against the defendants was obtained through the "bugging" of Bolland's and Arizti's rooms at the Hotel Elysee with electronic eavesdropping equipment. Appellants Bolland and Bruchon now contend that this evidence was inadmissible on two counts: (1) the eavesdropping was accomplished by the invasion of a constitutionally protected area; (2) the evidence was secured by official lawlessness prohibited by New York law and condemned by federal decisions. With respect to the first point, the trial court found, after a hearing on Bolland's pretrial motion to suppress the evidence, that the listening devices had been installed and utilized as the Government agents represented them to have been[4] and accordingly that there had been no technical trespass into either of the hotel rooms of the defendants, which is still essential to a violation of federal law under United States v. Goldman, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1943).[5] There is substantial evidence in the record to support those findings.

The real question here is whether the eavesdropping evidence was admis-

---

3. One subpoena was obtained on February 20, 1964, prior to defendants' arrest, and the other on April 22, 1964.

4. Appellants argued on the motion to suppress, with the use of photographs taken some time after the event, that the agents who occupied one of the adjoining rooms at the Hotel Elysee had gouged out the keyhole of the common door and planted a microphone in the depression. The Government proved to the satisfaction of the court, however, that that particular listening device had been taped over the keyhole, and not inside it, after the metal plate covering the keyhole had been swung aside.

Two other listening devices were utilized by the Government. In the room adjoining Bolland's at the Elysee, the narcotics agents placed a microphone in front of the small opening between the floor and the bottom of the common door that

separated the two rooms; it did not in any way penetrate under the door. And, in the Americana Hotel, the agents placed a microphone over a telephone wire and a hole, which was made to accommodate the wire, that ran through the common wall between the agents' room and Bruchon's adjoining room.

5. The concept of "physical trespass" has been further developed by the Supreme Court in decisions subsequent to Goldman. See Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961) and Clinton v. Virginia, 377 U.S. 158, 84 S.Ct. 1186, 12 L.Ed.2d 213 (1964), both "spike mike" cases. An informative article on the subject has been published by the Joint Committee on Continuing Legal Education of the American Law Institute and the American Bar Association entitled, "The Problem of Electronic Eavesdropping" (1961).

sible in a federal criminal proceeding in view of the fact that the New York legislature has seen fit specifically to prohibit eavesdropping. Sections 737–745 of the New York Penal Law, McKinney's Consol.Laws, c. 40, make it a felony, punishable by up to two years imprisonment, for a person, including "any law enforcement officer," to eavesdrop except where an ex parte order authorizing the eavesdropping has been granted pursuant to Section 813–a of the New York Code of Criminal Procedure.[6] Section 4506 of the Civil Practice Laws and Rules goes even farther by declaring that any evidence obtained by eavesdropping in vio-

6. Sections 737–745 of the New York Penal Law and Section 813-a of the Code of Criminal Procedure provide in pertinent part:

§ 738. Eavesdropping

A person:

1. not a sender or receiver of a telephone or telegraph communication who wilfully and by means of instrument overhears or records a telephone or telegraph communication, or who aids, authorizes, employs, procures or permits another to so do, without the consent of either a sender or receiver thereof; or

2. not present during a conversation or discussion who wilfully and by means of instrument overhears or records such conversation or discussion, or who aids, authorizes, employs, procures or permits another to so do, without the consent of a party to such conversation or discussion; or

3. who, not a member of a jury, records or listens to by means of instrument the deliberations of such jury or who aids, authorizes, employs, procures or permits another to so do; is guilty of eavesdropping.

§ 739. Exemption

There shall be exempt from the provisions of this article:

1. eavesdropping pursuant to an ex parte order granted pursuant to section eight hundred thirteen-a of the code of criminal procedure;

2. eavesdropping, as described in subdivision two of section seven hundred thirty-eight of this article, by a law enforcement officer pursuant to section eight hundred thirteen-b of the code of criminal procedure without an ex parte order obtained pursuant to section eight hundred thirteen-a of said code;

3. the normal operation of a telephone or telegraph corporation; and

4. the normal use of the services and facilities furnished by such corporation pursuant to its tariffs.

§ 740. Punishment for eavesdropping

A person who violates any subdivision of section seven hundred thirty-eight of this chapter shall be guilty of a felony punishable by imprisonment for not more than two years.

§ 741. Person defined

As used in this article, the word "person" shall mean any individual, partnership, corporation or association including the subscriber to the telephone or telegraph service involved and any law enforcement officer.

§ 813–a. Ex parte order for interception, overhearing or recording

An ex parte order for the interception, overhearing or recording of telegraphic or telephonic communications may be issued by any justice of the supreme court or judge of a county court or of the court of general sessions of the county of New York upon oath or affirmation of a district attorney, or of the attorney-general or of an officer above the rank of sergeant of any police department of the state or of any political subdivision thereof, that there is reasonable ground to believe that evidence of crime may be thus obtained and identifying the particular telephone number or telegraph line, and particularly describing the person or persons whose communications are to be intercepted, overheard or recorded and the purpose thereof. In connection with the issuance of such an order the justice or judge may examine on oath the applicant and any other witness he may produce and shall satisfy himself of the existence of reasonable grounds for the granting of such application. Any such order shall be effective for the time specified therein but not for a period of more than two months unless extended or renewed by the justice or judge who signed and issued the original order upon satisfying himself that such extension or renewal is in the public interest. Any such order together with the papers upon which the application was based, shall be delivered to and retained by the applicant as authority for intercepting, overhearing or recording, or directing the interception, overhearing or recording of the telegraphic or telephonic communications transmitted over the instrument or instruments described. A true copy of such order shall at all times be retained in his possession by the judge or justice issuing the same.

lation of the Penal Law and Section 813b of the Code of Criminal Procedure is inadmissible for any purpose in any civil or criminal proceeding.[7]

The New York statutes involved here, however, do not appear to have been intended to apply to federal law enforcement officers. Section 813–a of the Code of Criminal Procedure makes no provision for federal officers, as distinguished from state or local officers, to obtain ex parte orders permitting eavesdropping activities; the statute specifically limits the granting of such an order to a district attorney, the attorney-general or "an officer above the rank of sergeant of any police department of the state or of any political subdivision thereof." Under these circumstances, therefore, it seems most likely that the policing of the activities of federal officers was intended to be left to federal statute and the supervision of féderal courts, which so far have drawn the line at the point of physical trespass. United States v. Goldman, supra. In view of this construction, we need not even consider the power of a state to regulate the actions of federal law enforcement officers or the admissibility in a federal court of evidence procured by such officers in violation of state law. Cf. Olmstead v. United States, 277 U.S. 438, 468, 48 S.Ct. 564, 72 L.Ed. 944 (1928); On Lee v. United States, 343 U.S. 747, 754–755, 72 S.Ct. 967, 96 L.Ed. 1270 (1952).[8]

## IV. Illegal Importation and Constructive Possession

Bolland and Bruchon both attack the sufficiency of the proof with respect to their alleged illegal importation and constructive possession of the narcotics, contending that the Canadian and later the United States law enforcement officers as a matter of fact and of law had actual control of the bags originally containing the 62 kilograms of heroin from the time of their initial interception in Canada and continuing through their removal from and replacement in the parcel room of New York's Pennsylvania Station.

This argument we find without merit. When articles are moving in transit, under the arrangements of criminal conspirators, law enforcement agencies should not be denied the opportunity of allowing some part of the contraband to continue in movement for the purpose of snaring and acquiring evidence against all those implicated in the particular plan. In this case, Arizti, and not the federal agents, transported the heroin into this country. And so long as the movement continued, which it did, and control, however temporary, was possible in both Bolland and Bruchon, who at one time or another possessed the claim checks and the baggage keys, sufficient dominion to establish constructive possession was present with respect to each. Whether the agents would have been

---

**7.** Section 4506 reads:

Evidence obtained by any act of eavesdropping, in violation of section seven hundred thirty-eight of the penal law, or by any act in violation of section eight hundred thirteen-b of the code of criminal procedure, or by eavesdropping without court order, as permitted by said section of the code of criminal procedure, when an application for such order is thereafter made as required by said section but is denied, and evidence obtained through or resulting from information obtained by any such act, shall be inadmissible for any purpose in any civil or criminal action, proceeding or hearing; provided, however, that any such evidence shall

be admissible in any civil or criminal action, proceeding or hearing against the person who has, or is alleged to have, violated section seven hundred thirty-eight of the penal law or section eight hundred thirteen-b of the code of criminal procedure.

**8.** We may also note that Bruchon's standing to object to eavesdropping on others is doubtful, and that the essential portions of the information obtained by eavesdropping on Bolland were also independently gained by the surveillance carried on during the entire course of the transactions. It was the surveillance rather than the eavesdropping that led to Bruchon.

successful in halting the asportation from Pennsylvania Station, had the claim check holder taken the bags from the parcel room, is immaterial.

Both Bolland and Bruchon, at one time or another, had actual possession of the baggage checks and keys. Arizti testified that upon his arrival in New York, he immediately met with Bolland in his room at the Elysee and turned over the baggage checks and keys to Bolland. Apart from that testimony, it was reasonable for the jury to conclude from the fact that Bruchon had the keys and checks shortly before he was apprehended that he had received them from Bolland since Government surveillance revealed that Bolland was the only person he had seen at the Americana who could have given them to him.

Here, Bolland's and Bruchon's actual possession of the keys and checks was sufficient to establish constructive possession of the bags of heroin. "Constructive possession" is that which exists without personal occupation of land or without actual personal present dominion over a chattel, but with intent and capability to maintain control and dominion. Rodella v. United States, 286 F.2d 306, 311 (9 Cir. 1960), cert. den. 365 U.S. 889, 81 S.Ct. 1042, 6 L.Ed.2d 199 (1961). Possession may, but need not, imply title. See also United States v. Santore, 290 F.2d 51, 60–61 (2 Cir.), rehearing en banc, 290 F.2d 74 (1960), cert. den. 365 U.S. 834, 81 S.Ct. 745, 5 L.Ed.2d 743 (1961); Covarrubias v. United States, 290 F.2d 157, 158 (9 Cir.), cert. den. 368 U.S. 859, 82 S.Ct. 101, 7 L.Ed.2d 56 (1961); United States v. Buonanno, 290 F.2d 585, 586 (2 Cir. 1961); Teasley v. United States, 292 F.2d 460, 467–468 (9 Cir. 1961); Ramirez v. United States, 294 F.2d 277, 283 (9 Cir. 1961); United States v. Ladson, 294 F.2d 535, 540–541 (2 Cir. 1961), cert. den. 369 U.S. 824, 82 S.Ct. 840, 7 L.Ed.2d 789 (1962); Hernandez v. United States, 300 F.2d 114, 116–117 (9 Cir. 1962). And circumstantial evidence alone may be utilized to determine the fact of possession. Rodella v. United States, supra. Aside from the appellants' possession of the baggage checks and keys, there was also present here strong circumstantial evidence of actual knowledge of illegal importation.

■ The fact that the Government obtained a search warrant within just two hours after the bags arrived in New York City did not interfere with Bolland's and Bruchon's constructive possession of the narcotics after that time. A search warrant is required only to prevent an unreasonable and, therefore, illegal search and seizure, and it does not require that the law enforcement officers take instant possession of any contraband that they might thereby discover. "To require immediate seizure of the contraband upon discovery would deprive federal officers of a most effective method of obtaining evidence against ultimate consignees * * *." United States v. Davis, 272 F.2d 149, 153 (7 Cir. 1959). Rule 41 of the Federal Rules of Criminal Procedure requires only that the return be prompt and that, in any case, the return be within 10 days of the warrant. We find here no violation of either the terms or spirit of the rule.

## V. Admission and Production of Other Evidence

Appellants cite several errors allegedly committed by the trial court in permitting the admission of certain evidence and in refusing to compel the Government to produce certain other evidence. We hold that all the rulings were properly within the discretion of the court.

■ Bruchon's separate attack on the admissibility of the agent's testimony of Bolland's statement to Arizti that "in the past the man has always been here when I arrived" as merely narrative of past occurrences is not well taken, for the narration was not merely historical but was relevant to the criminal conspiracy in which Bolland, Arizti and Bruchon were engaging. A statement of one conspirator to another during the active course of a conspiracy, giving the full setting of an upset, with the purpose of getting reassurance or other help, does not cease to be in fur-

therance of the conspiracy because it contains a natural and pertinent reference to a past fact. Cf. United States v. Annunziato, 293 F.2d 373, 380 (2 Cir.), cert. denied 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961).

Bolland claims that he was irreparably prejudiced by the introduction of testimony with regard to Coscia and Giacobetti, two alleged co-conspirators. However, testimony as to their activities and declarations was properly admitted as evidence of acts in furtherance of the conspiracy. The existence of the conspiracy was clearly established, and, once it has been so proved, only evidence which, viewed alone, is of relatively slight import, is needed to connect each conspirator with it. United States v. Marchisio, 344 F.2d 653 (2 Cir. 1965); Poliafico v. United States, 237 F.2d 97, 104 (6 Cir. 1956), cert. den. 352 U.S. 1025, 77 S.Ct. 590, 1 L.Ed.2d 597 (1957).

Finally, appellants contend that the trial court should have ordered the production of a signed statement that the Government's witness Hyacinthe Lucchesi gave to the French Sureté. Lucchesi, the owner of the hotel to which Bolland addressed his two cablegrams, testified on direct examination, among other things, that he had been instructed by Coscia to turn over to him all mail and other communications addressed to "Carmen Lopez" and that he had in fact done just that. On cross-examination he revealed that he had given the French police a signed statement which related to this and other testimony. While this statement might well have been ordered produced if available, the court, relying on the representation of a French officer that French law forbade its production, was within its discretion in refusing to order it.

## VI.

Other miscellaneous errors allegedly committed by the trial court are urged upon us by appellants. We find them all to be without merit. The judgments of conviction of Pardo-Bolland and Bruchon are affirmed

The court is indebted to Albert J. Krieger, assigned counsel, for his diligent efforts on Bruchon's behalf both on trial and appeal.