**UNITED STATES of America**

v.

**Walter SECOR, Defendant.**

**No. 65 Cr. 1163.**

United States District Court
S. D. New York.

Oct. 26, 1966.

Robert M. Morgenthau, U. S. Atty., Southern District of New York, Charles P. Sifton, Asst. U. S. Atty., for plaintiff.

Joseph Stone, New York City, for defendant.

MOTLEY, District Judge.

*Findings of Fact*

Defendant, Walter R. Secor, was charged in a two-count information with wilful failure to pay the tax imposed on persons in the business of accepting and receiving wagers and wilful failure to register as a person so engaged.[1] These charges cover a period from on or about the 30th day of September 1965 up to and including the 8th day of October 1965. During this time, Special Agent Bruce Murray of the Internal Revenue Service visited defendant's place of business, Tom's Tavern, Bronx, New York,

on six different occasions, each time placing a policy wager with defendant. About noon on the first of these occasions, October 1, Murray went to the tavern with another individual who did not know that Murray was working as an undercover agent. When they entered, defendant was standing at the end of the bar on the customer's side in a position that gave him an unobstructed view of the front door. There were about four other persons in the bar at this time, including the bartender. Murray and his companion approached defendant and the companion placed a policy wager with him. The wager was recorded on a small piece of newspaper and the money was pocketed by the accused. At this point, Murray's companion assured defendant that she knew Murray and told defendant that Murray wanted to "get something in". Defendant replied, "sure" and Murray proceeded to place a policy bet with defendant, a record of which was duly made upon the same piece of newspaper and the money similarly pocketed. Immediately after placing his wager, Murray saw another individual come in, place a policy wager with defendant, and leave. Before they too departed, Murray and his companion had drinks at the bar. The money paid for these drinks was put into the cash register.

At approximately the same time on October 4, 5, 6, 7, and 8, 1965, Murray returned to Tom's Tavern and placed policy wagers with defendant in much the same manner as he did on his original visit. While at the tavern on October

1. Sec. 4401 of the Internal Revenue Code imposes an excise tax on wagering transactions, and makes liable for its payment persons who are "engaged in the business of accepting wagers" and on those who conduct "any wagering pool or lottery". Sec. 4411 imposes a special $50 tax "by each person who is liable for tax under section 4401 or who is engaged in receiving wagers for or on behalf of any person so liable". Sec. 4412 requires anyone required to pay special tax to register his name, place of residence, and certain other information with the Internal Revenue Service. Sec. 7262 pro-

vides for a fine of $1,000 to $5,000 to be imposed on persons who are liable for special occupational tax under Sec. 4411 and fail to pay it. Sec. 7203, which is a general statute not related solely to the wagering tax provisions, declares that any person required to "pay any * * * tax * * * make a return * * * keep any records * * * or supply any information," who wilfully fails to do the required acts, shall be guilty of a misdemeanor and upon conviction be fined up to $10,000, imprisoned up to 1 year or both.

4, Murray saw another individual place a policy wager with defendant. On October 5, Murray witnessed "about five persons" placing bets with defendant in the tavern—one was a horse racing wager. Once again Murray had a drink at the bar and again the bartender put the money for this drink in the cash register. The following day, October 6, Murray again placed a wager with defendant, who was operating from the bartender's side of the bar—the bartender not being present. Defendant placed the $10 bill which Murray gave him for a $2 wager in a cigar box next to the cash register, and gave Murray $8 change. While there Murray heard another individual also place a bet with defendant. Murray returned to Tom's Tavern on October 7, and again placed a wager with defendant.

Before setting out for Tom's Tavern on October 8, Murray recorded the serial number of a $10 bill and marked it with a special crayon. These markings are visible to the naked eye only under ultraviolet light. Murray also briefed another agent, John Cotter, on the Secor investigation on October 8 prior to entering the tavern and gave him a piece of paper bearing the serial number of the marked $10 bill. At about noon that day, Murray again went to Tom's Tavern and placed a wager with defendant. This time, however, Murray paid defendant with the marked $10 bill. Defendant gave the bill to the bartender who put it in a cigar box adjacent to the cash register. Murray then left the premises and on his two-way radio called Cotter who was in the vicinity with other agents and a detective from the New York City Police Department.

Cotter entered the tavern, carrying with him an arrest warrant, which though it did not contain defendant's name, had a description of the person to be arrested. There were about 3 or 4 persons in the tavern when Cotter entered. Cotter approached defendant and put him under arrest. Identifying himself, Cotter gave the arrest warrant to defendant to read and explained it to

him. Cotter inquired of defendant whether he was the owner of the premises and defendant replied in the affirmative. Defendant was searched by Cotter, as was the area in the immediate proximity. In a cigar box near the cash register Cotter found $40 in currency. Upon comparing the currency he found a $10 bill in that box with the same serial number he had on the piece of paper Murray had given him earlier in the day. Cotter also found and seized $5,000 in a compartment under the counter of the back bar, $900 in a glass on the back bar, $372 in another cigar box on the back bar counter and $315 in a wallet which was on the back bar. This money was all found within 10 to 15 feet of where defendant was standing when arrested. The money in the cash register was not seized.

Agent Murray, who has been a special agent for approximately eleven years, all but one of which has been spent on wagering tax investigations, and who has been involved in about 75–100 wagering investigations, testified that it was customary for numbers writers to have substantial amounts of cash on hand. This cash would represent receipts from the wagering operation, cash to pay off winning bettors and for the expenses of the operation.

In addition Murray testified that there has been a large amount of publicity concerning the Federal wagering tax requirements. He testified that in the 11 years that he has been a Special Agent, through cooperation with the mass communications media, there has been a constant program of public information on the wagering tax laws. On occasion, Murray, himself, has caused information to be published on this subject. The Government introduced a file of clippings, covering the period from June 1964 through September 25, 1965, from newspapers of general circulation, all dealing with the requirements of the Federal wagering tax laws. Three issues of the Mamaroneck Daily Times, published while defendant was a subscriber to that paper, contained articles

dealing with the wagering tax law requirements.

Testimony of Government's witness, Harry D. Watson, an official of the State Liquor Authority, indicated that through defendant's retail liquor license renewal application for the period March 1, 1965–March 1, 1966 and the accompanying penal bond (filled out with the help of an attorney) defendant had shown his awareness that he stood to lose his liquor license for violations of the law. However, it is also clear that these documents give no indication of what specific law violations would have this result, or even of the existence of a Federal wagering tax law.

Thomas Beichert, Internal Revenue Service Unit Supervisor in charge of records for Manhattan, Bronx and Staten Island, testified that for the period 1964–1966 there is no record of defendant registering or paying the tax required by Federal law. The Internal Revenue Service records also show that defendant paid the required retail liquor dealers tax for 1965–1966.

### Conclusions of Law

■■ During the trial, defense counsel raised questions concerning both the validity of the search made at the time of arrest and the admissibility of items seized in the course of that search. In addition, the defense relied heavily upon what it charged was the Government's inability to prove the element of "wilfulness" in the commission of the crimes charged. Though the arresting officer did not have a search warrant, the arrest was made pursuant to an arrest warrant. It is a well settled principle of law that no search warrant is necessary to validate a search made incident to a lawful arrest. United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950). There seems to be no real question about the lawfulness of the arrest. Defense counsel may have been getting at questions about the arrest rather obliquely through his line of questioning of Cotter concerning the "John Doe" arrest warrant. However, counsel did not directly make this an issue, and this line of questioning was probably more geared to raising doubts as to whether there had been confusion resulting from the investigation made prior to arrest in this case and another simultaneous investigation. There was a slight discrepancy in the arrest warrant, however. It was headed "United States of America v. John Doe", followed by a description of the person to be arrested, but the body of the warrant commanded that "Jim Doe" be arrested. Nonetheless, this variance would seem far from fatal as the crucial thing in a John Doe warrant like this one is the description of the person to be arrested and not the arbitrary name tag attached to him. The warrant was based upon extensive prior investigation covering a span of several days. There can be no doubt as to the existence of probable cause and the lawfulness of the arrest here. See, Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed. 2d 441 (1963), and cases cited 479–484. The arrest being lawful, the search incident to it was as well. *Rabinowitz*, supra. Agent Cotter established that Secor was the owner of the premises upon arresting him and the search made incident to that arrest was limited in both time and scope. As the Supreme Court declared in Agnello v. United States, 269 U.S. 20, at p. 30, 46 S.Ct. 4, at p. 5, 70 L. Ed. 145.

"The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody, is not to be doubted."

The extent of the search fell well within the broad limits permitted in Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947) where the Supreme Court affirmed the validity of a five-hour search of all four rooms of an apartment undertaken as an incident

to a lawful arrest. There is no merit to the claim that the search was invalid.

Even if the search were lawful, defense counsel challenges the validity of the seizure made in the course of that search. Relying upon a recent Fourth Circuit opinion by Circuit Judge Sobeloff, Hayden v. Warden, Maryland Penitentiary, 363 F.2d 647 (1966), defendant argues that items having evidential value only are not subject to seizure and must be excluded at trial. This is a correct statement of the law, well grounded in the earlier Supreme Court holdings in Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921) and United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877 (1932). The view that a search for evidence, with or without a warrant, is invalid is explicitly followed in this Circuit, see, e. g., United States v. Alberti, 120 F.Supp. 171 (1954), though recently a more permissive statement of the rule has been adopted in the case of United States v. Pardo-Bolland, 229 F.Supp. 473 (D.C.S.D.N.Y.1964), aff'd, 348 F.2d 316 (2d Cir. 1965), which allows the seizure of evidence if it is reasonable to believe it *could* be an instrumentality of the crime. See, also Note, "Evidentiary Searches: The Rule and the Reason" 54 The Georgetown L.J. 593 (Winter 1966).

■ In any case, though defendant's statement of the law is correct it will lend him no succor in this case. The other half of the *Gouled-Lefkowitz* doctrine, which he neglects to mention, is that the "fruits of the crime," and the means or instrumentalities by which it was committed, (as distinguished from evidence only) are seizable. The money used in carrying on an illegal gambling operation is clearly seizable as the "fruits" or "instrumentality" of the crime. United States v. Dornblut, 261 F.2d 949 (2d Cir. 1958); United States v. Currency in Total Amount of $2,223.40, 157 F.Supp. 300 (N.D.N.Y.1957); see, also United States v. Joseph, 174 F.Supp. 539 (E.D.Pa. 1959); Appell v. United States, 29 F.2d 279 (5th Cir. 1928); Furlong v. United States, 10 F.2d 492 (8th Cir. 1926);

United States v. $1,508.40, 158 F.Supp. 916 (S.D.Ill.1958). It is the court's view that the money in question was a part of the gambling operation.

■ Showing wilfulness by direct evidence presents no small difficulty. However, the courts have not made the Government's burden impossible. Wilfulness, as an element of the crime, must be shown beyond a reasonable doubt, but it may be proved by circumstantial evidence. Ingram v. United States, 360 U.S. 672, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959); United States v. Marquez, 332 F.2d 162 (2d Cir. 1964). The court in *Marquez*, in following the Supreme Court's decision on this question ruled, at page 165:

> "On balance, however, we believe the import of the Ingram decision to be that evidence of attempts to conceal the operation of a lottery by one who participates in its operation and is liable for the taxes imposed by Congress suffices to show the element of knowledge circumstantially and to justify conviction of a wilful failure to pay the tax and to register. In this, we are in accord with the great weight of authority on this topic."

(Cases cited omitted).

Concealment in *Ingram* was a key factor in finding the wilful violation. In the instant case, the Government has no direct evidence of wilfulness but relies upon the concealment and furtiveness of the gambling operation involved. More specifically, the Government pointed to the fact that defendant's "records" in this case were small, easily disposable slips of paper and tearings from newspapers. A substantial sum of money, $5,000, was found in a compartment under the counter of the back bar. Lesser sums were also found in places which give rise to the inference that concealment was the motive for such placement since there was a cash register nearby. In a glass on the back bar was $900. A cigar box on the back bar contained $372. A wallet with $315 was also found on the back bar. In still another cigar box on the back bar near the cash register was found $40.

This box contained the marked $10 bill. The Government argued further that the tavern, itself, provided a convenient facade for defendant's wagering activities. Other circumstantial factors relied on by the Government to prove the defendant's wilfulness were that a prospective bettor had to be introduced to defendant and vouched for before defendant would accept his wager, defendant was familiar with the jargon of the gambling trade ("get something in"), and defendant stationed himself in the bar at a position from which he could observe all comings and goings from across the room. The first and last of these factors go to the concealment question. The other both to show concealment and familiarity with such operations.

To strengthen its case, the Government offered as evidence of defendant's knowledge the fact that defendant applied for and received a New York State Liquor License and acknowledged on his bond his obligation to inform himself of and abide by Federal and State laws. It should be noted, however, that the bond did not specify any particular law. The Government noted that the record discloses that defendant was not lacking in sophistication. Defendant had the services of an attorney in connection with his liquor license application and was aware of and paid the Federal excise tax on retail liquor dealers.

Finally, the Government relied on its evidence (Government's Exhibits 5, 6, 7, 8) that there had been a great deal of publicity, in the year preceding defendant's arrest, in newspapers of general circulation in the New York area and in defendant's immediate residential locale about the wagering tax laws to support an inference of knowledge on defendant's part.

■ Although it may seem a sizable leap to infer knowledge from the foregoing facts, the Government's evidence, in the light of applicable recent cases, is ample enough to support a finding of wilfulness in the commission of the offense charged here.

The search, limited in scope and made incident to a lawful arrest, gives defendant no grounds for objection. The money seized was part of the gambling operation. Its seizure was lawful as the "fruit" or "instrumentality" of the crimes. Defendant's apparently deep involvement in the illegal operation, his concealment of the business, his sophistication about liquor business matters, the publication of news about the tax, all taken together, support a finding of knowledge and a conclusion of wilful violation, despite all this evidence being circumstantial.

At the outset, defendant challenged, on self incrimination grounds, the constitutionality of the Federal statutes involved under the Fifth Amendment to the Federal Constitution. Defendant is aware that this challenge has been foreclosed by recent prior decisions of the United States Supreme Court, Lewis v. United States, 348 U.S. 419, 75 S.Ct. 415, 99 L.Ed. 475 (1955); United States v. Kahriger, 345 U.S. 22, 73 S.Ct. 510, 97 L.Ed. 754 (1953), and the Court of Appeals for this Circuit, United States v. Costello, 352 F.2d 848 (2nd Cir. 1965), cert. granted, 383 U.S. 942, 86 S.Ct. 1195, 16 L.Ed.2d 205 (Mar. 22, 1966); United States v. Millo, 354 F.2d 224 (2nd Cir. 1965); United States v. Conti, 361 F.2d 153 (2nd Cir. June 1, 1966); United States v. Serao, 367 F.2d 347 (2nd Cir. Oct. 20, 1966).

However, defendant seeks to breathe new life into his self incrimination claim by pointing to the fact that when the arrest of defendant was made here, the Federal agents were accompanied by a State authority, i. e., a detective of the New York City Police Department, and, consequently, the self incrimination aspect of the law is inescapable.

■ Gambling is illegal under New York law as it is in most states. In the Costello case, supra, the Federal agents worked with the State authorities (although not local) in effecting arrests. It is true that it does not appear that defense counsel in Costello raised the same salient point in connection with the self

incrimination argument there. However, the United States Supreme Court has agreed to review the *Costello* decision which does raise the basic Fifth Amendment claim, inter alia, and which was rejected by the Second Circuit in accordance with the majority views expressed in *Lewis* and *Kahriger*, supra. Moreover, the Second Circuit similarly has followed the Supreme Court's ruling on this point since that Court's agreement to review the *Costello* case. *Millo, Conti,* and *Serao,* supra. It is no more the function of this court to anticipate the United States Supreme Court than it is the function of the Court of Appeals. Until the Supreme Court actually reverses its prior decisions on the Fifth Amendment's applicability to the statutes involved here, this court, as the Second Circuit, is bound to follow and to apply the law as settled by recent unreversed opinions.

The fact that there was a New York City detective present when the arrest here was made does not seem to add any dimension of constitutional significance to the basic Fifth Amendment argument previously advanced by other defendants. All the state presence here does, for purposes of the Fifth Amendment claim, is to emphasize the fact that the activity made the basis of the information filed against defendant here was also a violation of State law; and that if defendant had registered and paid the required tax, he would have exposed himself to state prosecution.[2] The Supreme Court squarely faced this problem in the *Lewis* case where gambling was illegal under the laws of the District of Columbia. Despite this fact, the Court held at 422 of 348 U.S., at 417 of 75 S.Ct:

> If petitioner desires to engage in an unlawful business, he does so only on his own volition. The fact that he may elect to pay the tax and make the proscribed disclosures required by the Act

is a matter of his choice. *There is nothing compulsory about it, and, consequently, there is nothing violative of the Fifth Amendment.* If he does not pay the occupational tax, proceeds to accept wagers, and is prosecuted therefor, as in this case, he cannot be compelled to testify and may claim his privilege. The only compulsion under the Act is that requiring the decision which would-be gamblers must make at the threshold. They may have to give up gambling, but there is no constitutional right to gamble. If they elect to wager, though it be unlawful, they must pay the tax. (Emphasis added.)

There were dissents in the *Lewis* and *Kahriger* cases on the ground that the natural operation and effect of the Federal statutes on wagering in a jurisdiction where wagering is illegal shows the clearest possible violation of Fifth Amendment rights. A new majority may adopt the minority reasoning upon review of the *Costello* case; but, as stated above, this court is without authority to substitute the minority view until the Supreme Court does.

Upon the trial, this court reserved rulings upon objections to the admissibility of certain evidence in order to expedite the trial, no jury being present. The evidence offered by the Government to which defendant objected was the following: 1) the marked ten dollar bill;[3] 2) the large sums of money seized by the arresting officer in the tavern at time of arrest;[4] 3) Agent Murray's memorandum relating to the serial number on the marked ten dollar bill;[5] 4) an Internal Revenue Service file of newspaper clippings from several New York City area newspapers relating to the wagering tax requirement which appeared during the course of a year prior to defendant's arrest;[6] 5) three issues of the Mamaroneck *Daily Times*, a local news-

---

2. The point seems more relevant to the Tenth Amendment which defendant has not raised but which was raised in the *Costello* case in the Court of Appeals.

3. Govt's Exhibit 1B

4. Govt's Exhibit 1

5. Govt's Exhibit 9

6. Govt's Exhibit 5

paper to which defendant subscribed during the period of his arrest.[7]

■■ The court now rules this evidence admissible for the following reasons: 1) the ten dollar bill was the fruit of the crime and continuity of possession was shown from the witness to defendant, the owner of the premises; 2) the large sums of money, seized in a search made incident to a valid arrest, are also the fruits or instrumentalities of a crime; [8] 3) Agent Murray's memorandum which recorded the serial number on the marked ten dollar bill is a recordation of past recollection, since there was no adequate present recollection after looking at the record of the essential facts recorded; [9] 4) the several articles from newspapers of general circulation in the New York area and the three issues of the local paper are admissible on the question of knowledge since the court now finds defendant was deeply engaged in the wagering business and such persons usually keep themselves informed as to events affecting this business—there is thus sufficient connection between defendant and the articles so as to permit the court to draw the inference that defendant saw at least some of the articles or obtained knowledge from them.[10]

■■ The Government objected to admission of the line of questioning relating to Agent Murray's association with and investigation of one Fata, another wagering situation. The questions and answers were admitted subject to connection. This was also the case with Agent Murray's diary and the questioning about Murray's other betting activities. Sufficient connection was demonstrated in that the defense through this testimony raised the possibility of confusion of this investigation and subsequent arrest with other investigations Murray was conducting simultaneously. Defendant failed to show any such confusion but the evidence was relevant on the question of the validity of the arrest and therefore will not be excluded. The questioning of Murray on his familiarity with recent amendments to New York State's Motor Vehicle laws is admitted. Since the Government was seeking to establish the proposition that one engaged in a business will have a certain familiarity with laws affecting that business, defendant should be allowed to show by way of rebuttal that this is not necessarily the case. The court also admits the line of questioning relating to joint investigations of other gambling cases by Agent Cotter and New York City Detective Gillon. Since a main pillar of the defense was a constitutional argument of self incrimination, this evidence was admitted. It comes in because of its possible relevancy, by way of presenting new evidence, though in the light of settled law on this question it turned out in fact to carry no weight.

Based upon the foregoing findings of fact and conclusions of law, this court finds and holds that defendant is guilty of a wilful failure to pay the special occupational tax imposed upon those engaged in the business of receiving and accepting wagers and wilful failure to register as required by Chapter 35, Sections 4411 and 4412, of the Internal Revenue Code.

7. Govt's Exhibits 6, 7, 8.

8. Defendant moved to strike all testimony relating to the monies and the monies on the grounds: 1) the money was illegally seized, no search warrant having been issued and, 2) no continuity of possession was shown from the witness to defendant.

9. Murray was the Agent who prepared the memorandum. He had first knowledge. It was prepared when he clearly and accurately remembered, at or near the time of the event, when there was no reason not to record accurately and honestly.

10. The court finds that there is sufficient connection to admit Govt's Exhibits 5, 6, 7, and 8 into evidence but also believes that same is merely cumulative on the issue of wilfulness. This element has been established through proof of the furtiveness with which defendant operated. The New York Herald Tribune article, Govt's Exhibit 4 for identification, was not offered in evidence, but counsel for the Government properly used the article to refresh the witness' recollection.